**UNITED STATES DISTRICT COURT**
<u>**SOUTHERN DISTRICT OF NEW YORK**</u>

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | CASE NO. S5 21 CR. 603 (VEC) |
| - v. - | |
| PATRICK KHAZIRAN | |
| a/k/a "Dr. Pat," | |
| Defendant. | |

**SENTENCING MEMORANDUM ON BEHALF OF**
**DEFENDANT PATRICK KHAZIRAN**

**JEFFER MANGELS BUTLER & MITCHELL LLP**
Vince Farhat
Lena Streisand
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
(310) 203-8080

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ..........................................................................................................3

I.     PAT'S PERSONAL HISTORY .............................................................................3

    A.    Pat's Childhood, Education, and Career ...................................................4

    B.    Pat's Devotion to His Family...................................................................6

    C.    Pat's Dedication to His Patients, Friends, and Community.......................9

II.    PAT'S OFFENSE CONDUCT AND PLEA .........................................................12

    A.    Pat's Guilty Plea ...................................................................................13

    B.    The Consequences of Pat's Guilty Plea .................................................14

ARGUMENT .............................................................................................................15

I.    PAT'S CESSATION IN THE OFFENSE CONDUCT, ACCEPTANCE OF
    RESPONSIBILITY, AND THE GREAT LENGTHS HE UNDERTOOK TO
    ASSIST THE GOVERNMENT WARRANT A SPLIT SENTENCE OF ONE
    YEAR AND ONE DAY ...................................................................................16

    A.    Pat Ceased Activity in the Conspiracy..................................................16

    B.    Pat and his Companies Cooperated and Assisted in the Government's
    Investigation.........................................................................................17

    C.    Pat Promptly Took Responsibility for His Conduct ...............................18

II.    PAT'S PERSONAL HISTORY AND CHARACTERISTICS SUPPORT
    LENIENCY ...................................................................................................19

    A.    Pat's Commitment to His Family and the Impact Incarceration Would
    Have on his Wife and Children...............................................................20

    B.    Dr. Pat's Dedication to His Patients, Employees, Friends, and Members of
    His Community......................................................................................22

III.    THE REMAINING STATUTORY SENTENCING FACTORS FURTHER
    SUPPORT A BELOW-GUIDELINES SENTENCE ......................................................25

    A.    A Below-Guidelines Sentence of One Year and a Day, Split Between
    Incarceration and Home Confinement, Achieves Sentencing Objectives ............25

        1.    Pat is a First-Time Offender Who Does Not Pose a Risk of
        Recidivism ...............................................................................26

        2.    A Below-Guidelines Sentence Will Promote Respect for the Law
        and Effect General Deterrence...................................................27

        3.    A Split Sentence is Significant Enough to Account for the
        Seriousness of Pat's Offense.....................................................29

i

B.      A Split Sentence of One Year and One Day Avoids Unwarranted
        Sentencing Disparities ............................................................................30

C.      The Need to Provide Restitution to Victims .........................................31

**CONCLUSION** ............................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)...............................................................................19, 27

*United States v. Alba*,
    933 F.2d 1117 (2d Cir. 1991)..................................................................................................20

*United States v. Booker*,
    543 U.S. 220 (2005)..................................................................................................................22

*United States v. Collins*,
    No. 07 CR 1170 (LAP) (S.D.N.Y. July 15, 2013).................................................................28

*United States v. Isola*,
    548 F. App'x 723 (2d Cir. 2013) .............................................................................................20

*United States v. Johnson*,
    964 F.2d 124 (2d Cir. 1992)....................................................................................................20

*United States v. Nesbeth*,
    188 F. Supp. 3d 179 (E.D.N.Y. 2016) ...................................................................................28

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009).....................................................................................................28

**Statutes**

18 U.S.C. § 1349.............................................................................................................................13

18 U.S.C. § 3553........................................................................................................... *passim*

**Other Authorities**

Annual Report and Sourcebook of Fed. Sent'g Stats. 87, Table 9 (U.S. Sent'g
    Comm'n 2021)...........................................................................................................................30

Appl. Note 1(B), U.S. Sent'g Guidelines Manual § 3E1.1 (U.S. Sent'g Comm'n
    2021) .........................................................................................................................................18

Appl. Note 1(H), U.S. Sent'g Guidelines Manual § 3E1.1 (U.S. Sent'g Comm'n
    2021) .........................................................................................................................................18

Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent
    Children*, NAT'L INSTITUTE JUST. J. (May 2017) ...................................................................21

Ivan Moreno, *LA Chiropractor Cops To NBA Health Plan Fraud Scheme*,
LAW360 (June 27, 2022 at 2:26 PM),
https://www.law360.com/articles/1506090?copied=1 ............................................................ 15

Laurel Davis & Rebecca J. Shlafer, *Mental Health of Adolescents with Currently
and Formerly Incarcerated Patients*, J. ADOLESC. at 120–134 (Jan. 2017) ........................... 21

*U.S. Attorney Announces Guilty Plea By A Chiropractor For Defrauding The
NBA Players' Health And Welfare Benefit Plan*, D.O.J. (Jun. 24, 2022),
https://www.justice.gov/usao-sdny/pr/us-attorney-announces-guilty-plea-
chiropractor-defrauding-nba-players-health-and ................................................................... 15

U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive
Overview* (March 2016) ......................................................................................................... 26

U.S. Sent'g Guidelines Manual § 5A (U.S. Sent'g Comm'n 2021) ............................................. 30

## PRELIMINARY STATEMENT

Patrick Khaziran ("Pat") stands before this Court with overwhelming guilt and deep remorse for his actions in this case, for which he takes full responsibility.  Pat's offense is an aberration in an otherwise law-abiding life.  Pat is a first-time offender with no other criminal history, and the instant offense is an anomaly in a life and career otherwise defined by his generosity, hard work, kindness, and devotion to his family, patients, and community.

In part because his criminal conduct was so out of character, Pat stopped his involvement in the criminal activity before learning of the FBI investigation.  Upon learning of the criminal investigation, he immediately took responsibility for his actions.  As the Government states in its Sentencing Memorandum, "Khaziran voluntarily surrendered and took accountability for his conduct before he was formally charged or had viewed the evidence procured by the Government in its investigation."  (Gov's Sent'g Mem. at 4, ECF No. 748.)  He is the only defendant in this case to have accepted responsibility without being indicted, and he voluntarily surrendered to law enforcement after reaching a pre-indictment resolution of the Government's investigation.  Upon receiving subpoenas both personally and on behalf of his companies, Sports Rehab LA ("SRLA") and Advanced Chiropractic Rehab Center ("ACRC"), Pat and his companies made six document productions to the Government and produced a records custodian from the companies to provide additional information to the Government.  Pat also repeatedly offered to provide the Government with relevant information beyond that compelled by subpoena.  Recognizing that his criminal conduct was out of character, that Pat voluntarily ceased wrongdoing while others who were part of the scheme continued, and that Pat undertook great efforts to mitigate his wrongful actions by being cooperative with law enforcement and accepting responsibility and pleading guilty pre-indictment, the U.S. Probation Office ("USPO") recommends a sentence—twenty-four months—that is substantially below the applicable

guidelines range of thirty to thirty-seven months. (PSR at 31). Pat respectfully submits that even a more substantial variation from the guidelines would be appropriate here, and asks the Court to impose a sentence of one year and one day, to be split between imprisonment and home confinement. This "split" sentence of a year and a day is sufficient but not greater than necessary to further the goals of sentencing.

Pat has already suffered enormously as a result of his offense and is wracked with guilt over what he did. His businesses have also suffered tremendously; it is unclear if they will survive, jeopardizing his ability to provide for his young family. He anticipates facing proceedings before the Chiropractic Board of Examiners, which may suspend or revoke his chiropractic license, further diminishing his earning potential. Lengthy incarceration is more likely to lead to revocation of his chiropractic license, which would be catastrophic to his ability to support his family.

Pat's offense has put strain on his relationship with his wife, Rosie. (PSR ¶ 121). Should Pat be incarcerated for some period of time—which he understands is a likely scenario—Rosie, who works at the practice for little money, will become the sole provider and caretaker for Pat's children, K████ (11) and S██ (9), who mean the world to him. Rosie describes the effect that a lengthy custodial sentence will have on the family:

> [Pat] will always put his family first and will make any sacrifice for his children. Our kids love their dad very deeply. Patrick helps tuck both the kids into bed every night and helps me out in any way that he can. I know that if he is taken away from us the children will miss him dearly and I need his support to help raise our kids. It will be a hardship for me to sustain the kids' school, activities, and their emotional wellbeing if Patrick is not around to help me.

(Letter from R. Kamalmazyan, Ex. A at 2).

Distance—physical and emotional—between Pat and his wife and children, will inevitably increase the familial stress and burden, and Pat is heartbroken that his actions are

causing his family such pain.  (*See id.* at 1–2).  Regardless, Rosie will support him through

incarceration.  Pat is tortured day in and day out by the prospect of trauma his wife and children

have suffered and will continue to suffer as a result of his poor choices, and he is committed to

righting his wrongs.  (*See id.*)

      For these reasons and those set forth below, the Court should impose on Pat a split

sentence of one year and one day.

**BACKGROUND**

### I.    PAT'S PERSONAL HISTORY

      Pat's criminal conduct is "completely out of his character."  (PSR ¶ 122).  It is a stark

departure from a life otherwise characterized by generosity, kindness, positivity, and empathy.

Pat takes full responsibility and accountability for his actions, yet he is not defined by them.  To

his wife, Pat is "selfless," (Letter from R. Kamalmazyan, Ex. A at 2), to his friends, Pat is a "man

that has no deceit in him," (Letter from Dr. J. Darmo, Ex. E at 1), a "genuine and honest" person

who treats everyone like family, (Letter from M. Martin, Ex. F; Letter from M. Meadows, Ex.

G), and "inspires all of us through his hard work and kind heart" (Letter from Sargis Khaziran,

Ex. C).  Pat is a community leader who has devoted a significant amount of his life to helping

members of his and other communities.  (*See* Letter from Dr. J. Darmo, Ex. E at 1; Letter from

M. Martin, Ex. F; Letter from H. Haroutunian, Ex. H at 1).  Most of all, Pat is a devoted father,

husband, son, and friend.  (*See* PSR ¶¶ 121, 122; Letter from R. Kamalmazyan, Ex. A at 1–2;

Letter from Stephanie Khaziran, Ex. B at 1; Letter from Sargis Khaziran, Ex. C; Letter from P.

Sterin, Ex. I at 1).

      As those close to him well know, Pat shares a special bond with his children (PSR ¶ 121)

and is an active, hands-on dad: he coaches his kids' sports teams, brings them to school every

morning, and tucks them into bed every night.  (*See, e.g.*, Letter from Stephanie Khaziran, Ex. B

3

at 1).  He and his wife have a true partnership.  (*See* PSR ¶ 121; Letter from R. Kamalmazyan, Ex. A at 1).  Pat is also very close to his parents, who live nearby him and see him regularly, (Letter from Sargis Khaziran, Ex. C) and his sister, who lives in northern California (Letter from Stephanie Khaziran, Ex. B at 1).  His absence would inflict severe damage on each of his family members, most especially his children, who are at formative stages in their lives.  (Letter from R. Kamalmazyan, Ex. A at 1–2; Letter from Stephanie Khaziran, Ex. B at 1).  Pat is wracked with guilt over what he has done:

> [Patrick] is very stressed out and has been up at night for the past year reflecting on his actions. He is struggling with anxiety. Patrick is an extremely positive person and I have never seen something shake his spirit like the regret he has as a result of his crime. He tries his best to hide it from the outside world so he can still be positive for his patients. But I know this case has been breaking him down. He is very sorry for his wrongdoing.

(Letter from R. Kamalmazyan, Ex. A at 2).

### A.   Pat's Childhood, Education, and Career

Pat was born and raised in Los Angeles, California.  (PSR ¶ 119).  His parents, Sargis and Frida Khaziran, immigrated to the United States as a result of the religious persecution they faced as Christians in Iran.  (*Id.* ¶ 120).  They arrived in the United States with nothing but a suitcase.  (*Id.*)  Sargis and Frida both worked diligently to provide for Pat and his sister, but often struggled to make ends meet.  (*Id.*)  As Iranian refugees, Pat's parents grappled with the challenges and stress of assimilating to life in a foreign country, which led to conflict at home.  (*See* Letter from Stephanie Khaziran, Ex. B at 1).  Regardless of the challenges the family faced while Pat and Stephanie were growing up, they remain close.  (PSR ¶ 120).

When they were young, Pat was Stephanie's "protector."  (Letter from Stephanie Khaziran, Ex. B at 1).  "He stepped in and always defended me, whether it was from bullies in

elementary school, or serving as an intermediary between my parents when they would fight."

(*Id.*)  However, Pat struggled to keep up in school:

> Even though my brother was four years older than me, I would often
> help him with his homework. I loved school and was the
> "booksmart" [*sic*] kid, while Patrick was passionate about sports.
> After finishing high school, I saw how much he struggled to make
> it through community college and then chiropractic school. The
> hours were grueling and demanded so much of him for many years.

(*Id.*)  In her letter, Stephanie describes that she had never seen her parents as proud as they were

on the day of Pat's graduation from chiropractic school:  "The sacrifice they went through, from

leaving their home country to working multiple jobs at a time to support their kids, paid off—

their kid became a doctor, and more significantly, a healer."  (*Id.*)

When Pat earned his chiropractic license, he worked tirelessly to build and expand his

chiropractic practice from a single patient room to a large facility that treats everyone from

neighbors to professional athletes.  (*See id.* at 1; Letter from H. Haroutunian, Ex. H at 1; Letter

from P. Sterin, Ex. I at 1).  Pat cares very much about his work and takes a "personal interest" in

every one of his patients.  (Letter from M. Marrache, Ex. J at 1).  Henry H. Haroutunian, a

lawyer and Pat's friend of over twenty years, writes:

> His clinic became known throughout our small community as the
> place to go if one ever needed any type of healing.  Patrick would
> not only provide treatment to heal their bodies, but his advice and
> positivity would heal their spirits as well.

(Letter from H. Haroutunian, Ex. H at 1).  Pat's ability to motivate his patients often provided

them with the strength they needed to travel the painful road from physical injury to recovery.

(*See* Letter from M. Marrache, Ex. J at 1).  As Pat's cousin, Justin Rezvani, puts it:  "Often, Pat is

dealing with people on their worst days. My cousin has a rare gift for guiding people through

difficult physical rehabilitation with genuine personal warmth."  (Letter from J. Rezvani, Ex. D).

Pat has a uniquely special ability to restore hope within his patients, not only through his

chiropractic skills but through his positivity and willingness to help.  (*See id.*)

> **B.**       **Pat's Devotion to His Family**

Pat is devoted to his family.  He and his wife Rosie have been together for about eighteen

years and married for ten.  (PSR ¶¶ 121, 122).  They have two wonderful children, K███ (11)

and S██ (9).  (*Id.* ¶ 121).  As a husband, Pat is the "most kind, giving, loving and patient

person," (PSR ¶ 122).  Rosie writes, "Patrick is not just my husband, but my best friend and my

rock, who supports me through thick and thin."  (Letter from R. Kamalmazyan, Ex. A at 1).

"[T]"here is nothing more important to Patrick than his kids."  (Letter from Stephanie

Khaziran, Ex. B at 1).  Pat is actively involved in K███ and S██'s lives and day-to-day

activities, and he shares a strong bond with them.  (PSR ¶ 122).  Rosie describes how involved

Pat is with his kids:

> K███ is a competitive ice skater. Patrick wakes up 4 days a week
> at 6:00 a.m. to take her ice skating before she goes to school. He
> helps her with everything from tying her skates to putting her hair
> in a bun. Patrick does not know anything about figure skating, but
> he will do anything to support his daughter, even if that means
> waking up early just to take her skating. It is their special time
> together. Our daughter loves her ice skating routine with Patrick and
> looks forward to it every day. . . . Every Saturday, Patrick drives an
> hour and a half to and from Long Beach for K███ to ice skate.
>
> Our son S██ plays hockey and loves the drama club at his school.
> Last year, S██'s drama club needed someone to help them raise
> money for stages and costumes. . . . When Patrick realized no other
> parents were offering their help, he volunteered to do the job. He did
> it to support his son and make sure the school could afford to have
> a play that year. This is just Patrick's nature. He will do anything to
> support and spend time with our kids.

(Letter from R. Kamalmazyan, Ex. A at 1).  Similarly, when S██'s hockey division was without

a coach, "Patrick stepped up to the plate and volunteered his time to coach the team, so our son

6

and all the other kids who were moving up into that division would have the opportunity to play." (*Id.*) Pat also provides them with emotional support. He is their confidante. They come to him for advice. And when he is at home with them, they follow him around the house—where he goes, they go.

> Stephanie provides further insight into how Pat embraces fatherhood:
>
> I've seen my brother accomplish so many things . . . Nothing makes me prouder of him than seeing who he is as a father to my niece and nephew, K███ and S██. From the moment his wife became pregnant, my brother embraced what it means to be a dad. He ensured he was there to support his wife through her pregnancy. He worked hard to move them from a one-bedroom apartment in LA to a smaller house in a safer community, even if it meant a longer commute for him. Even now, he is so present with his kids, despite his demanding work schedule. He spends his weekends coaching S██'s hockey team and driving K███ to ice skating practices hours away in Long Beach. Whenever I Facetime [*sic*] him at night to talk, he is with the kids, watching movies with S██ or brushing K███'s hair. S██ refuses to go to sleep until Patrick tucks him in and says goodnight. There is nothing more important to Patrick than his kids.

(Letter from Stephanie Khaziran, Ex. B at 1–2).

Similarly, Sargis writes that of all Pat's accomplishments, he and Frida are most proud of the "kind of dad he is." (Letter from Sargis Khaziran, Ex. C). "Patrick never spends time for himself," Sargis notes. (*Id.*) "He always dedicates his time to his children and is present with them." (*Id.*)

In fact, nearly every letter written on Pat's behalf describes Pat's close relationship with his children, who are his "top priority":

> Based on all the time I have spent with Patrick, I have come to know that his family is his top priority. I remember how he would rush home from his clinic each night to spend time with his two children. They meant everything to him and his eyes would light up whenever he would speak about them. . . . If he is taken away from his children, he and his family will suffer immensely.

(Letter from H. Haroutunian, Ex. H at 2).

> Patrick is also a family man. He is a great father to his children and great husband to his wife. He is always involved with his wife and kids, they are always together. The only time he is away from his family is during work. . . . One year, we could not drive out to Valencia to take our daughters to Patrick's daughter's birthday party. Patrick drove for over an hour from Valencia to Los Angeles to pick them up and bring them to the party.

(Letter from P. Sterin, Ex. I at 1).

Dr. James Darmo, Pat's friend and priest, has observed that Pat only misses church "when his kids have events.  He attends every event involving his son and his daughter."  (Letter from Dr. J. Darmo, Ex. E at 1).  A lengthy custodial sentence would cause Pat to miss K████'s middle school graduation.  (*See* Letter from R. Kamalmazyan, Ex. A at 1).  He would not get to see her compete in Nationals for figure skating.  (*Id.*)  He would miss S███'s production of Peter Pan.  (*Id.*)  Pat's children are his world and he is distraught over the harm he has inflicted on them by committing this offense.

Pat is also close to and cares for his parents.  (*See* Letter from Sargis Khaziran, Ex. C). As his parents get older, they rely more on Pat's help:

> Over the years, as my wife and I have gotten older, we have relied on Patrick more and more for help. When we both had COVID-19, he ensured we got medical care. When we need help in the house, he makes time on the weekend or evening to come help us with things I can't do myself anymore. My wife has had injuries and health scares over the years, including cancer, and we relied on Patrick to help explain things to us and to talk to her medical team to make sure she was getting the right treatment. He was the only person she trusted and who knew how to calm her fears and worries.

(*Id.*)

Pat has always taken it upon himself to care for his family members.  Pat's father describes Pat's role in caring for Pat's grandmother at the end of her life:

8

> When our parents were still alive, Patrick would regularly visit them
> and check in on them. When they had health complications, he was
> involved in making sure they got the right care. When my mother
> was in a nursing home before she passed, Patrick would visit her
> until someone else arrived. . . . Patrick volunteered himself to help
> even when his schedule was so busy.

(*Id.*)  Pat's family means the world to him, and losing time with his aging parents will devastate
him.

### C.     Pat's Dedication to His Patients, Friends, and Community

In addition to his family, Pat is also dedicated to his patients, his friends, and his
community.  Pat is a natural healer and helper.  He became a chiropractor out of his desire to
heal those in pain.  Often those patients who need the most healing cannot afford Pat's services.
Since becoming a licensed chiropractor, Pat has welcomed indigent patients to his practice,
where he provides them with free services that allow these individuals an opportunity for
rehabilitation, which they otherwise might not achieve.  Pat has numerous patients that he has
treated at no cost for years, and who are immensely grateful to Pat.  (*See* Letter from M. Martin,
Ex. F; Letter from M. Meadows, Ex. G).  One of these patients, Marcus Martin, who has been
seeing Pat for nine years, had no way of paying for physical therapy when he first found Pat:



> Coming out of college I had limited resources and virtually no
> money at all. ████████████████████████████████████
> ████████████████████████████████████████████
> ████████████████████ . . . [H]e was virtually doing
> charity work, knowing I was unable to front the bill.

(Letter from M. Martin, Ex. F).

Similarly, when Mike Meadows met Pat, he could not afford for Pat to treat his son, who
at the time was a young athlete with great potential but ████████ . (*See* Letter from M.

Meadows, Ex. G).  In his letter, Mike explains how Pat nonetheless agreed to treat Mike's son, which had an instrumental impact on Mike's son's future:

> When I met Pat, I was a single father living in Los Angeles, California. My son is now a Division 1 athlete. Without Dr. Khaziran's good heart, I'm not sure that would have happened. From the time I met Dr. Khaziran he treated me and my son like family. . . . I can't count the number of times where Dr. Khaziran did things for free. . . . He would get nothing out of treating a kid with a single dad for free. But like always he was just trying to help.

(*Id.*)  Pat is constantly giving himself to others.  Thirteen years later, Pat is still close with Mike and his son.

Beyond simply agreeing to treat individuals who need but cannot afford his services, Pat has affirmatively expanded his outreach to the greater community.  For example, through SRLA, Pat has created several community initiatives to help those often inflicted by injury and physical pain.  Several years ago, Pat started an informal program to offer free services to local firemen and police officers.   Pat also provides discounted services to low-income students, (Letter from M. Martin, Ex. F), and before the onset of the COVID-19 Pandemic, Pat was developing a student internship program at SRLA where chiropractic students would provide therapy to indigent patients.

After pleading guilty, Pat's practice lost its ability to bill insurance companies for its services.  As a result, some of Pat's patients who are in desperate need of physical therapy can no longer afford to pay him.  Pat has continued to treat some of these patients free of charge.  Pat is invested in his patients and their recovery, even when their circumstances change and they are not able to afford him.  The wellbeing of Pat's patients means much more to him than any money he makes from treating them.

As others have recognized, Pat's work in his community reaches far beyond his commitment to helping rehabilitate those who cannot afford the cost of physical therapy.  "Pat is a pillar of the San Fernando Valley community," (*id.*), and "the caregiver for our entire . . . community" (Letter from Sargis Khaziran, Ex. C).  "His work extends beyond the business and spills out into the community.  (Letter from M. Martin. Ex. F).  Pat is "a person that our community needs . . . Young people look up to him and he's an exemplary for the kids in our church."  (Letter from Dr. J. Darmo, Ex. E at 1).

A few years ago, Dr. Darmo decided to change careers from chiropractor to priest.  Pat was by his side, helping Father Darmo get established in their community:

> When I was ordained, I wanted to find a church in Valencia, CA where I could do my service.  Pat found me a church, helped me negotiate the price, and paid the church's rent for months before I could afford it. . . . Once we got the church and established the mission, Pat and his wife offered to start a Sunday school for the kids who attended our church so he could teach them the bible.

(*Id.* at 1).

Pat shows the same generosity and care to friends who need money or other assistance:

> [Pat] loans money to friends who are in need to help them start their businesses. He will use any connections he has to help friends get their businesses started. He helped one of our mutual friends open up his own juice bar so that our friend could have a business of his own.

(Letter from P. Sterin, Ex. I at 1).

Pat helps his community in other ways as well.  For example, he donates sports gear signed by professional athletes to the schools in Valencia.  He coaches his son and daughter's local Valencia sports teams.  (*See* PSR ¶ 122).  He creates physical therapy regimens for local Valencia intramural sports teams.  (*See* Letter from M. Marrache, Ex. J at 1).  He regularly donates to his church and his son's drama camp.  (*See* Letter from Dr. J. Darmo, Ex. E at 1).

He offers bible studies for his staff and those involved in his church.  He checks in on the elderly members of his church and ensures they are in good health.  (*See* Letter from Sargis Khaziran, Ex. C).  Pat's generosity with his time, financial support, and effort to help others over the years, exemplifies who he is as a person.

## II.       PAT'S OFFENSE CONDUCT AND PLEA

Indeed, it was Pat's inclination to help others that put him in a position to commit the offense, which he deeply regrets.  In or around 2016, a retired NBA player approached Pat because he needed money for certain familial obligations.  He asked if Pat could give the player money and charge the debit card linked to the player's National Basketball Association Players' Health and Welfare Benefit Plan (the "Plan"), formerly known as the National Basketball Players' Association – National Basketball Association (NBPA-NBA) Supplemental Benefit Plan, for reimbursement.  The player represented to Pat that the bank account linked to his Plan debit card contained money that belonged to the player and had been taken out of the player's previous paychecks.  Pat empathized with the player's sense of desperation and desire to provide for his family—Pat, who was trying to get his business off the ground at the time, understood the financial pressures of providing for a family and wanted to help.  He loaned the player a few thousand dollars, which he charged to the Plan debit card for reimbursement in increments.  Pat initially did this for no personal gain (although that changed over time).

In the beginning, Pat loaned cash to some of his patients, which was reimbursed to Pat through charges to the Plan debit card.  To receive reimbursement from the Plan, Pat at times submitted invoices showing he provided services in connection with a given charge.  (*See* PSR ¶ 42).  When he was charging a player for cash, Pat submitted invoices to the Plan for services that were not rendered.  (*Id.* ¶ 41).  Occasionally, the Plan would reach out to the player directly

for substantiating evidence of the player's requested reimbursements. (*See id.* ¶ 42). In those instances, Pat provided false invoices for his services directly to the player for the player to submit to the Plan. (*See* ¶ 41).

What was at first an infrequent "favor" to patients quickly spiraled out of control. Word of Pat's practice grew among retired NBA players. Suddenly he faced an influx of patients seeking to collect cash from their Plan bank accounts. Many of those patients saw Pat for treatment and to collect cash. Some retired NBA players who were not patients of Pat's practice reached out to Pat to tap the funds in their Plan bank accounts. Around this time, Pat started keeping approximately 33% of the reimbursed funds for himself. (*Id.* ¶¶ 41, 42). While this was happening, Pat was facing two critical stressors in his personal and professional life. First, Pat's mother was diagnosed with breast cancer. (*Id.* ¶ 119). Second, Pat was working tirelessly to build his business and provide for his family. Pat informs the Court of his circumstances for context and understanding, not to justify or excuse his behavior.

Unlike any of the other defendants in this case, Pat accepted responsibility for his actions prior to any arrest or indictment. As explained below, Pat also ended his involvement in the offense conduct. Pat responded to multiple subpoenas served on him and his companies, and offered to meet with law enforcement agents investigating his and others' conduct. Pat also produced a records custodian from his companies to provide additional information, which the Government used to strengthen its allegations in the superseding indictment (S7) in this case.

A. **Pat's Guilty Plea**

On June 24, 2022, Pat voluntarily surrendered and pled guilty to Count 1 of Superseding Information S5 21 CR 603 (VEC), charging him with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. (PSR ¶ 4). Pursuant to the plea agreement, Pat stipulated to a loss amount of $1.3 million and a guidelines offense level of nineteen. (*Id.* ¶¶ 5(a)(iv), (vii)).

Pat agreed to pay the stipulated loss amount of $1.3 million in restitution and consented to a forfeiture amount of approximately $429,000, representing the money Pat personally received from his criminal conduct.  (*Id.* ¶¶ 5(c)(v)–(v)(i)).

As to sentencing, the parties' plea agreement provides:

> The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

(Khaziran Plea Agreement at 3).

### B.     The Consequences of Pat's Guilty Plea

Pat accepts full responsibility for his actions and in no way intends to excuse them.  He understands that his offense was serious, and he is horrified that he lost sight of his moral compass and he is no longer the role model he has always tried to be for his children.  We respectfully submit to the Court that the consequences Pat has suffered since pleading guilty are relevant to the Court's considerations in determining his sentence.

Pat has agreed to pay $1.3 million in restitution.  He stands to lose his chiropractic license, temporarily if not permanently, which will have a tremendous impact on his future earning ability.  Pat and his practice lost the ability to submit claims to insurance, which accounted for 85% of its business.  Thus, Pat's earning ability has already decreased significantly.  Pat is the sole provider for his family.  Rosie will have to find a job in order to support their children while Pat is incarcerated.  Pat's banking and credit card companies closed his accounts and he has had difficulty finding a bank willing to accept his business.  The U.S.

Attorney's Office issued a press release when Pat pled guilty, and nearly all subsequent press regarding the case mentions Pat's involvement.[1]

While he recognizes that his own actions got him here, Pat is tortured by the damage he has caused and the ensuing harm to his children and family of any prison term.

## ARGUMENT

18 U.S.C. § 3553 requires that the Court impose "a sentence sufficient, but not greater than necessary . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a).  In determining a sufficient sentence, the Court must also consider the following factors:

- "the nature and circumstances of the offense and the history and characteristics of the defendant;" § 3553(a)(1)

- "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;" § 3553(a)(3)

- "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" § 3553(a)(6) and

- "the need to provide restitution to any victims of the offense." § 3553(a)(7)

A split sentence of one year and one day—half of which to be served in prison and the other half on home confinement—accounts for these factors while satisfying the objectives of

---

[1] *U.S. Attorney Announces Guilty Plea By A Chiropractor For Defrauding The NBA Players' Health And Welfare Benefit Plan*, D.O.J. (Jun. 24, 2022), https://www.justice.gov/usao-sdny/pr/us-attorney-announces-guilty-plea-chiropractor-defrauding-nba-players-health-and; *see also, e.g.*, Ivan Moreno, *LA Chiropractor Cops To NBA Health Plan Fraud Scheme*, LAW360 (June 27, 2022 at 2:26 PM), https://www.law360.com/articles/1506090?copied=1.

sentencing.  The nature and circumstances of Pat's offense support leniency in sentencing because Pat voluntarily ceased engagement in and promptly accepted responsibility for his criminal conduct.  Pat's personal history and characteristics support leniency in sentencing because other than this offense, Pat has lived a law-abiding life characterized by his devotion to his family, patients, employees, friends, and community.  As the USPO recognizes, Pat's familial obligations and exceptionally close relationship with his children justify a below-guidelines sentence.  (PSR at 31).  Further, a below-guidelines sentence achieves sentencing objectives because Pat will not recidivate, a split sentence will still promote respect for the law, effect deterrence, and properly account for the seriousness of Pat's offense.  A below-guidelines sentence also avoids disparities in sentencing.  Finally, Pat has agreed to pay restitution in the amount of $1.3 million.

I.     **PAT'S CESSATION IN THE OFFENSE CONDUCT, ACCEPTANCE OF RESPONSIBILITY, AND THE GREAT LENGTHS HE UNDERTOOK TO ASSIST THE GOVERNMENT WARRANT A SPLIT SENTENCE OF ONE YEAR AND ONE DAY**

When determining a defendant's sentence, the Court must consider the nature and circumstances of the offense.  18 U.S.C. § 3553(a)(1).

A.     <u>**Pat Ceased Activity in the Conspiracy**</u>

Pat's cessation of criminal conduct and acceptance of responsibility, including efforts to cooperate with the government, warrant a more lenient sentence than that called for by the advisory sentencing guidelines.  A split sentence of one year and one day is appropriate in this case.

 In or around early 2017, Defendant Terrence Williams contacted Pat to book an appointment for physical therapy.  After seeing Pat a few times as a patient, Williams began requesting invoices from Pat for services not rendered, which Pat, at times, provided.  However,

in or around late 2017 or early 2018, Pat discovered that Williams or someone working with

Williams had fabricated over sixty invoices that purported to have been issued by Pat's

companies.  Pat was furious.  In or around early 2018, Pat confronted Williams and told

Williams that Pat wanted no further involvement in the offense conduct.  (*See, e.g.*, Gov. Sent'g

Mem. at 2 ("After Khaziran stopped creating invoices and charging cards, Williams recruited

CC-1 who created invoices that appeared to emanate from Khaziran's office when they did

not."); PSR ¶ 43 ("Between approximately November 2017 and December 2017, and from

approximately November 2018 to June 2019, at the direction of WILLIAMS, CC-1 created fake

Chiropractic Office-1 invoices for [defendants] and emailed them to WILLIAMS. At this time,

KHAZIRAN was no longer involved in the creation of fraudulent Chiropractic Office-1

invoices."), ¶ 44 ("After KHAZIRAN ceased creating fraudulent invoices for former NBA

players, WILLIAMS enlisted the assistance of CC-1 and CC-2 to create invoices for the

scheme."), ¶¶ 45–57 (describing Williams, CC-1, and CC-2's fabrication of documents

purporting to be from Pat's practice)).  Pat did this because the conduct was wrong, not because

of the prospect of getting in trouble (at the time, Pat was unaware of any FBI investigation).  He

understood the gravity of the scheme and wanted no part in it.  Pat felt ashamed of his

participation in the offense conduct.

> **B.**    **Pat and his Companies Cooperated and Assisted in the Government's Investigation**

Pat's cooperation in and assistance with the Government's investigation also support a

more lenient sentence.  In October of 2021, Pat, SRLA, and ACRC received subpoenas related to

the activities of this prosecution.  Pat and his companies promptly complied, making a total of

six document productions to the Government.  Upon the Government's request, Pat also

coordinated for a records custodian from his businesses to fly to New York and to provide

additional information to investigators.  At Pat's direction, defense counsel made numerous
attorney proffers to the Government and repeatedly offered to make Pat available for an
interview with law enforcement.

The Government used documents produced by Pat and authenticated by his companies'
records custodian to advance its case against the other defendants.  But for the cooperation of
Pat, SRLA, and ACRC, it would have been much harder for the U.S. Attorney's Office to bring
Superseding Indictment S7 21 CR 603 (VEC), ECF No. 497.  Paragraphs 25 through 37 of
Superseding Indictment S7 are based on documents issued by or purporting to have been issued
by Pat's companies.  (Superseding Indictment S7 21 CR 603 (VEC), ECF No. 497).  As of the
date of this submission, three defendants have pleaded guilty to counts in Superseding
Indictment S7.

### C.    Pat Promptly Took Responsibility for His Conduct

When determining how to sentence a defendant, one mitigating factor the Court should
consider is "the timeliness of the defendant's conduct in manifesting the acceptance of
responsibility."[2]   "[V]oluntary termination or withdrawal from criminal conduct or associations"
is an early sign of acceptance of responsibility.[3]  Not only did Pat voluntarily end his criminal
involvement with Defendant Williams, he also assisted the Government's investigation,
promptly pled guilty to his crime, and agreed to pay restitution for the loss amount of $1.3
million.  Several years before he interacted with law enforcement, three Plan attorneys
questioned Pat about invoices he had submitted to the Plan.  At the time, he was not represented
by counsel.  Scared and confused, Pat was not forthcoming with the attorneys.  He regrets this

---

[2] Appl. Note 1(H), U.S. Sent'g Guidelines Manual § 3E1.1 (U.S. Sent'g Comm'n 2021).
[3] Appl. Note 1(B), U.S. Sent'g Guidelines Manual § 3E1.1 (U.S. Sent'g Comm'n 2021).

deeply.  That regret in part motivated him to accept responsibility for his actions once he retained

with counsel.

Today, Pat is the only of twenty-four defendants to have pled guilty pre-indictment.  (*See*

Gov's Sent'g Mem. at 4, ECF No. 748 ("Khaziran voluntarily surrendered and took

accountability for his conduct before he was formally charged or had viewed the evidence

procured by the Government in its investigation.")).  To date, he is the only doctor of the three

involved in this prosecution to have pled guilty.  Pat accepts responsibility for abusing his

position by submitting fraudulent invoices to the Plan for medical services that were not rendered

and he stipulated to an enhancement under the guidelines for abuse of trust.  Such conduct is out

of character for Pat and he is deeply remorseful for his actions.  Pat takes his role as a healer very

seriously.  He is ashamed and embarrassed that he compromised his morals and his sacred role as

someone who helps others, and has to live with the fact that he has not been the role model for

his children and others that he has always strived to be.

## II.   PAT'S PERSONAL HISTORY AND CHARACTERISTICS SUPPORT LENIENCY

When imposing a sentence, the Court must consider the defendant's personal history and

characteristics.  18 U.S.C. § 3553(a)(1).  "[I]f ever a man is to receive credit for the good he has

done, and his immediate misconduct assessed in the context of his overall life hitherto, it should

be at the moment of his sentencing, when his very future hangs in the balance."  *United States v.*

*Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006).  Pat's personal history and

characteristics, as detailed herein, support leniency in his sentence.  Pat's offense was an

aberration in an otherwise law-abiding life and career.

A.   **Pat's Commitment to His Family and the Impact Incarceration Would Have on his Wife and Children**

A downward variance may be warranted where incarceration would lead to the "destruction of an otherwise strong family unit."  *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991); *see also United States v. Isola*, 548 F. App'x 723, 725 (2d Cir. 2013) (finding defendant's family circumstances and effects of incarceration on daughter among factors to be considered under 18 U.S.C. § 3553(a)); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (age, number, and circumstances of defendant's children are factors in determining whether downward variance is appropriate).  Consistent with this, the USPO has recommended a below-guidelines sentence in consideration of Pat's familial obligations.  (PSR ¶ 31).  A sentence of one year and a day, split between incarceration and home confinement, is appropriate here because Pat is instrumental in his children's lives, and his wife Rosie will not be able to handle all of the familial responsibilities without Pat.

K███ and S██ are very attached to Pat.  While they are close to their mother and paternal grandparents, Pat's incarceration would severely diminish K███ and S██'s support system.  The constraints on Rosie to provide for her family by seeking full-time employment during Pat's incarceration will undoubtedly limit her ability to spend time with her children, much less provide the same level of care and attention they have received for their entire lives.  (*See* Letter from R. Kamalmazyan, Ex. A at 2).  Rosie's mother died of Amyotrophic Lateral Sclerosis about eleven years ago and Rosie does not have a relationship with her father, so the kids do not have any maternal grandparents who can help Rosie.  (*See id.*)  Pat's father works full-time and is unable to care for the children during the weekdays.  (*See id.*)  Pat's mother has had health issues and other ailments that make it difficult for her to care for two young children.

(*See id.*; Letter from Sargis Khaziran, Ex. C)  As Rosie writes in her letter, "Without Patrick, I don't have enough support to do this."  (Letter from R. Kamalmazyan, Ex. A at 2).

Pat is the sole provider for his family (Rosie takes a negligible salary from SRLA). Without Pat, the family will struggle financially.  Rosie, who was previously a counselor for schools in the Los Angeles Unified School District, has been out of work for eight years.  (*See id.*)  Rosie does not have sufficient support to care for her children and work full-time.  (*See id.*) Without a full-time job, she may not be able to afford child care.  (*See id.*)  Indeed, it is not clear that Rosie can obtain a job that will pay for the cost of child care, particularly where it involves transporting one child hours each day while the other—only nine—cannot be left alone.

K███ (11) and S██ (9) are at ages of critical development.  Both K███ and S██ share a strong bond with their dad.  (PSR ¶ 121).  Pat coaches S██'s hockey team, takes K███ to ice skating practice, takes them to church and teaches their Sunday school, and tucks them in every night.  (Letter from R. Kamalmazyan, Ex. A at 1; Letter from Stephanie Khaziran, Ex. B at 1; Letter from Dr. J. Darmo, Ex. E at 1).  Many studies show the detrimental effect that parental incarceration has on young children.[4]  Pat humbly asks the Court to consider that the effects of a lengthy custodial sentence on his children could be pervasive and lasting, whereas a split sentence, served partially on home confinement, would alleviate a significant amount of the burden on Rosie and be less impactful on their children.

---

[4] "[S]eparation from parents, loss of family income, housing instability, changes in caregiving, stressful visits with the incarcerated parent, and shame or stigma associated with a parent's involvement in the criminal justice system" can compromise a child's emotional wellbeing.  *See* Laurel Davis & Rebecca J. Shlafer, *Mental Health of Adolescents with Currently and Formerly Incarcerated Patients*, J. ADOLESC. at 120–134 (Jan. 2017).  Children with at least one incarcerated parent are more likely to develop "psychological strain, antisocial behavior, suspension or expulsion from school, economic hardship, and criminal activity."  Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children*, NAT'L INSTITUTE JUST. J. at 10, 11 (May 2017).  Children with incarcerated or formerly incarcerated parents are also more likely to experience internalizing and suicidal ideations and are more likely to attempt suicide. *See* Davis & Shlafer, *supra*, at 120–134.

Pat is very close with his parents, who rely upon him increasingly as they age.  (*See* Letter from Sargis Khaziran, Ex. C; Letter from Stephanie Khaziran, Ex. B at 2).   Pat lives close to them, and he visits them regularly on the weekends and evenings. (*See* Letter from Sargis Khaziran, Ex. C).  He helps them around their home and cares for them when they are sick.  (*See id.*)  Sargis describes that when Frida was diagnosed with cancer, Pat was "the only person she trusted and who knew how to calm her fears and worries."  (*Id.*)  When his parents had COVID, Pat ensured they received proper medical care.  (*Id.*)  Importantly, when his parents are injured or sick, Pat, the only medical professional in the family, helps his parents understand their ailments and ease their worries.  (*See id.*)  With Stephanie in northern California, Pat's parents will not have anyone close by to care for them if Pat is given a lengthy custodial sentence.  (*See* Letter from Stephanie Khaziran, Ex. B at 1–2).

Pat's family circumstances warrant a sentence of one year and one day, split between incarceration and home confinement, would allow Pat to fully participate in child care and home responsibilities, is appropriate and warranted. *See generally United States v. Booker*, 543 U.S. 220 (2005).  Pat's children are at formative ages, and Pat is very involved in their lives.  Rosie does not have a strong support system to lean on, and Pat worries that the family unit will deteriorate if he is incarcerated for a long period of time, leaving Kay███ and S███ vulnerable to the lasting emotional and psychological consequences of parental incarceration.  A split sentence allows Pat to provide Rosie and the kids with the support they need.

**B.**     **Dr. Pat's Dedication to His Patients, Employees, Friends, and Members of His Community**

Letters submitted on behalf of Pat speak to his remarkable generosity and genuine desire to help others.  Pat "is someone I could count on to give me the shirt off of his back."  (Letter from Stephanie Khaziran, Ex. B at 1).  Throughout his life, Pat has "actively sought to help

22

people." (Letter from Dr. J. Darmo, Ex. E at 1).  He "will always go the extra mile to help . . .

his friends[] or anyone in need."  (Letter from P. Sterin, Ex. I at 1; *see also* Letter from M.

Meadows, Ex. G).

       Nearly every person who submitted a letter on Pat's behalf shared an anecdote about how

Pat's generosity—financial or otherwise—has helped them.  For example, while Pat's sister

Stephanie was in graduate school, Pat helped her make the down payment on her car.  (Letter

from Stephanie Khaziran, Ex. B at 1).  When Pat's friend and priest, Dr. Darmo, became

ordained, he could not afford to rent property in Valencia for his church.  (Letter from Dr. J.

Darmo, Ex. E at 1).  Pat found a church location, negotiated the lease on Dr. Darmo's behalf, and

paid the church's rent for months before Dr. Darmo could afford to pay it himself.  (*Id.*)  Pat used

all of his connections to help a friend open a juice bar so that the friend could have a business of

his own.  (Letter from P. Sterin, Ex. I at 1).

       These letters exemplify that Pat's abuse of his position as a chiropractor was an

aberration in a career otherwise defined by Pat using his abilities for the good of others.  For

example, Pat sometimes treats indigent patients for free.  (*See* Letter from M. Martin, Ex. F;

Letter from M. Meadows, Ex. G; *see also* Letter from R. Kamalmazyan, Ex. A at 2).  Rosie

notes:

> Another thing I have seen my husband do over and over again is
> provide free treatment and services to his patients that have
> experienced financial hardship. Patrick grew up with his parents
> both working full time jobs to support his family, so when he sees a
> struggling parent who cannot afford treatment for their child, it
> breaks his heart and he will help in any way he can, free of charge.

(Letter from R. Kamalmazyan, Ex. A at 2).

       In one instance, Pat and his staff 

free of charge so that          would be able to play football again in time for

the NFL draft.  (Letter from M. Martin, Ex. F).  In appreciation for the service of Valencia police

officers and firefighters, Pat provides them with physical therapy for free.  Pat also offers

discounted rates to high school athletes from local Valencia schools.  Before COVID, Pat was

developing a program for training new physical therapists by providing services to indigent

patients who needed chiropractic services.  Prior to pleading guilty, 85% of Pat's patients used

insurance to afford their physical therapy.  Since pleading guilty, insurance companies no longer

cover claims from Pat or his practice.  This left a number of Pat's most impacted patients without

affordable care.  Instead of refusing to see those patients now that they are unable to pay, Pat

continued to treat some of them free of charge so that they would not be left without care.

     As Mike Meadows, the father of one of Dr. Pat's patients, writes:

> I can't count the number of times where Dr. Khaziran did things for
> free. . . . He would get nothing out of treating a kid with a single dad
> for free. But like always he was just trying to help.

(Letter from M. Meadows, Ex. G).

     Letters submitted on Pat's behalf speak to the effect he has had on his patients, friends,

and members of his community.  For example, Marcus Martin, one of Pat's longtime patients,

writes:

> Pat has been more than a physical therapist in my life and has played
> a mentor role to me over the past 9 years.  The love, the wisdom, the
> guidance, the care, the words of encouragement and sometimes the
> laughter from Pat has helped me escape certain aspects of my
> upbringing and live with deliberate intentions.
>
> . . . Pat's influence in my life kept me from falling victim to my
> battles with depression, while dealing with the realities of being a
> 20 year old professional athlete bearing the weight of the world on
> my shoulders with virtually no guidance.  Our relationship has
> continued to blossom over the years, with ███████████████

(Letter from M. Martin, Ex. F).  These anecdotes will come as no surprise to those who know

Pat.  They are consistent with the kindness and care he applies in all situations.

     This care extends equally to those who work for him.  In the time between his guilty plea

and sentencing hearing, Pat has been working tirelessly to ensure that his business does not

shutter and that his employees remain employed should he be incarcerated. He has identified

new proposed operators for SRLA, which would ensure operations and management can run all

aspects of the business without him, and fostered relationships between his patients and his staff,

so that patients will feel comfortable and cared for, and be less likely to cease treatment in his

absence.

     As Sargis describes, Pat is the "caregiver for our entire extended family and community."

(Letter from Sargis Khaziran, Ex. C).  As an active member of his church, Pat has treated a

number of elderly members of his church.  When Pat attends church events with his parents,

Sargis notes that he "always see[s] [Pat] checking on many of the elderly people who have seen

him for treatment. He is always checking on them to make sure they aren't hurting, even after

they have left his office."  (*Id.*)  As Mr. Haroutunian aptly summarized, "The world would be a

better place if more people were as kind and decent as Patrick."  (Letter from H. Haroutunian,

Ex. H at 1).

     For those reasons, Pat respectfully submits that his personal history and characteristics

support a split sentence of one year and one day.

## III.   THE REMAINING STATUTORY SENTENCING FACTORS FURTHER SUPPORT A BELOW-GUIDELINES SENTENCE

### A.   A Below-Guidelines Sentence of One Year and a Day, Split Between Incarceration and Home Confinement, Achieves Sentencing Objectives

     The Court must fashion a sentence that is "sufficient, but not greater than necessary," to

further the relevant purposes of sentencing, including "to promote respect for the law," "to

provide just punishment for the offense," "to afford adequate deterrence to criminal conduct,"

"to protect the public from further crimes of the defendant," and "to provide the defendant with

needed educational or vocational training, medical care, or other correctional treatment in the

most effective manner." 18 U.S.C. § 3553(a)(2)(A)–(D). Given the circumstances here, a

sentence of one year and a day is sufficient to serve these purposes because Pat does not pose a

risk of recidivism and the requested sentence promotes respect for the law, effects deterrence,

and sufficiently accounts for the offense conduct.

### 1.      Pat is a First-Time Offender Who Does Not Pose a Risk of Recidivism

A lengthy sentence is unnecessary to deter Pat from reoffending.  Defendants with no

prior criminal history, like Pat, are least likely to recidivate.[5]  This is particularly true because

Pat voluntarily stopped his criminal conduct midstream.  Other than his totally uncharacteristic

criminal conduct, Pat has lived a law-abiding and praiseworthy life.  He is horrified by his

criminal behavior and understands the severity of what he has done and this prosecution and

conviction.  (*See* Letter from Stephanie Khaziran, Ex. B at 2; Letter from Sargis Khaziran, Ex. C;

Letter from J. Rezvani, Ex. D).  He is a first-time offender who has never been the subject of any

previous fraud investigations and, prior to the upcoming proceedings before the Chiropractic

Board of Examiners, had suffered no disciplinary actions.  Pat, with his long history of being a

productive, law-abiding person, will not re-offend.

As a result of the offense, the business Pat worked his whole life to build has suffered

immensely.  Pat will likely lose his chiropractic license—temporarily if not permanently—which

will greatly diminish his earning capacity.  His family will struggle financially.  Indeed, the

USPO recognizes the financial strain on Pat and is not recommending a fine.  (*See* PSR at 30).

---

[5] *See* U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at App'x A-2 (March 2016).

Pat's young children will suffer the effects of having an incarcerated parent.  Pat is consumed by guilt and remorse and does not pose a risk of reoffending; indeed, he is dedicated to righting his wrongs and being a worthy example for his children and his community.

> **2.     A Below-Guidelines Sentence Will Promote Respect for the Law and Effect General Deterrence**

A custodial sentence will constitute a sanction significant enough to promote respect for the law and deter other doctors from repeating conduct similar to Pat's offense.  Courts have recognized that general deterrence is not necessarily directly correlated to a lengthy sentence. *See Adelson*, 441 F. Supp. 2d at 514 (there is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).  A lengthy sentence of incarceration is not necessary to promote respect for the law, especially considering the collateral consequences that Pat and his family are already facing.

> **a.     *The collateral consequences of Pat's guilty plea are deterrents in themselves***

Pat accepts full responsibility for his conduct and offers no excuse.  He abused his position as a chiropractor and submitted fraudulent invoices to the Plan, for which he stipulated to a two-point enhancement under the guidelines.  His offense is serious, and as a result, he has already suffered significant consequences, as previously described.  We respectfully request that the Court consider how Pat has already suffered—the consequences he has faced and will continue to face—as the Court determines whether and what term of imprisonment would be appropriate in this case.

Courts routinely recognize that loss of career, reputation, income, and assets are sources of general deterrence that merit consideration in fashioning a sentence.  Indeed, the Second Circuit has explained that "[i]t is difficult to see how a court can properly calibrate a 'just

punishment' if it does not consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (destruction of defendant's career and livelihood "already visits substantial punishment on the defendant" and "therefore [] the need for further deterrence . . . is lessened").  District Courts have similarly found that a shorter sentence is adequate for general deterrence where the defendant has suffered significant financial, reputational, and career consequences.  *See, e.g.*, *United States v. Nesbeth*, 188 F. Supp. 3d 179, 187–88 (E.D.N.Y. 2016) (concluding collateral consequences are properly considered under § 3553(a) at sentencing; Sent'g Tr. 32:17–33:1, ECF No. 244, *United States v. Collins*, No. 07 CR 1170 (LAP) (S.D.N.Y. July 15, 2013) (finding lengthy prison sentence not necessary for deterrence because defendant lost standing in industry, lost earning ability, and faced financial ruin).

Prior to his guilty plea, about 85% of Pat's patients typically used insurance to pay for his services.  However, after Pat pled guilty, he and his practice were barred from billing insurance for services rendered.  Without insurance, a significant amount of Pat's patients can no longer afford to see him or his staff.  While Pat has continued to see some patients free of charge, he has lost a significant amount of patients, which has damaged his ability to provide financially for his family.

After Pat pled guilty, some of the banks where Pat previously kept his business and personal funds closed his accounts and barred him from banking with them in the future. Finally, Pat anticipates that he will face proceedings before the Chiropractic Board of Examiners. Pat stands to lose his license, either temporarily or permanently, which will severely diminish his earning potential.

Pat is the sole provider for his wife and two children.  As a result of the guilty plea, Rosie—the children's only caregiver—will need to find a job.  If Pat is incarcerated, Rosie will effectively become a single mother without significant support.  She will need to find a job, which is something she has not done in eight years.  As the only caregiver to her children, struggling financially without substantial support, Rosie will face difficulties finding a job that allows her the flexibility to care for her family and pays her enough to provide for them without Pat's help.  This is especially true considering how active Pat is in his children's lives.  Rosie will undoubtedly struggle to work, care for her children, coach their sports teams, drive them to practices, attend their plays and games, and work full-time.  (*See* Letter from R. Kamalmazyan, Ex. A at 1–2).  Any time Pat does not spend in prison will be dedicated to supporting his family and righting his wrongs.

These consequences, together with a split sentence of one year and one day, will sufficiently effect deterrence and promote respect for the law.

### 3.   A Split Sentence is Significant Enough to Account for the Seriousness of Pat's Offense

Pat has taken full responsibility for his unlawful conduct and understands the gravity of the poor choices he made, (*see* Letter from J. Rezvani, Ex. D), and he acknowledges that his participation in the offense was protracted.  Despite the seriousness of his offense, certain mitigating factors, as described herein, support the Court granting Pat leniency in sentencing. Pat voluntarily terminated his unlawful conduct, cooperated in the Government's investigation, and pled guilty pre-indictment.  Any custodial sentence, including a split sentence of six months and one day of imprisonment and six months of home confinement, will be sufficient to account for the seriousness of the crime he committed.

**B.**     **A Split Sentence of One Year and One Day Avoids Unwarranted Sentencing Disparities**

In determining the appropriate sentence, the Court is required to consider the need to avoid disparities in sentencing defendants with similar records for the same conduct. A court may depart from imposing a guidelines sentence where there exists "a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). The advisory sentencing guidelines range for a level nineteen offense is thirty to thirty-seven months.[6] However, Pat respectfully submits that the Court should impose a split sentence of one year and one day whereby he will spend six months and one day incarcerated and the remaining six months on home confinement. In 2021, 66.6% of the criminal defendants sentenced in the Southern District of New York received a downward variance from the applicable Guidelines range.[7] Further, the USPO recommends a below-guidelines sentence for Pat. (PSR at 31 ("Based on the history and characteristics of the defendant, including his familial obligations and his lack of criminal history, as well as his role in the instant offense and financial loss attributable to his conduct, we believe a sentence below guidelines is warranted.")).

To date, this Court has imposed a below-guidelines sentence on every defendant sentenced:

---

[6] U.S. Sent'g Guidelines Manual § 5A (U.S. Sent'g Comm'n 2021).
[7] Annual Report and Sourcebook of Fed. Sent'g Stats. 87, Table 9 (U.S. Sent'g Comm'n 2021).

| Defendant | Guidelines Range | USPO Recommendation[8] | Sentence Imposed |
|---|---|---|---|
| Christopher Douglas-Roberts | 10–16 months | Time served | Time served |
| Jamario Moon | 10–16 months | Time served | Time served |
| Eddie Robinson | 6–12 months | Time served | Time served |
| Anthony Wroten | 10–16 months | "below guideline" | Time served |

Moreover, some defendants who have pled guilty and await sentencing are more culpable than Pat.  For example, Keyon Dooling stipulated to an offense level of twenty when he pleaded guilty.  (*See* Dooling Plea Agreement at 2, ECF No. 516-3).  Similarly, Defendant Terrence Williams stipulated to a loss amount of $2.5 million—over a million dollars more than Pat's stipulated loss amount—when he pleaded guilty.  (*See* Tr. 11:23–25, ECF No. 523).  Further, the other medical professionals being prosecuted here have not entered into any plea agreements with the Government.  On the spectrum of culpability, Pat recognizes that he is not the least culpable, but respectfully submits to the Court that he is not the most culpable either.

Thus, imposing a guidelines sentence is inappropriate considering the sentences of the other defendants.

### C.    The Need to Provide Restitution to Victims

In determining a defendant's sentence, the Court must consider the need to provide restitution to victims of the offense.  Here, Pat has agreed to pay restitution in the loss amount of $1.3 million.

---

[8] Because PSRs are confidential, all recommendations by the USPO as represented in this chart are taken directly from the defendant's sentencing submission.  *See* C. Douglas-Roberts Sent'g Mem. at 9, ECF No. 598; J. Moon Sent'g Mem. at 4, ECF No. 604; E. Robinson Sent'g Mem. at 7 ECF No. 566; A. Wroten Sent'g Mem. at 14, ECF No. 665.

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court impose a sentence of one year and one day, to be split between incarceration and home confinement.  Such a sentence is sufficient but not greater than necessary to comply with the sentencing goals set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

December 29, 2022

*S/ Vince Farhat*
Vince Farhat
Lena Streisand
**JEFFER MANGELS BUTLER & MITCHELL LLP**
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
(310) 203-8080

*Attorneys for Defendant Patrick Khaziran*